6 U.S. 280 (____)
2 Cranch 280
M'ILVAINE
v.
COXE'S LESSEE.[]
Supreme Court of United States.

The material facts of the case are stated in the argument of W. Tilghman.
W. Tilghman, for plaintiff in error.
*284 This case presents three subjects for consideration.
1. What was the situation of Daniel Coxe, with respect to his citizenship or alienage, from the commencement of the Revolution to the definitive treaty of peace between the United States and Great-Britain?
2. What was his situation from the time of the treaty to the death of Rebecca Coxe in 1802?
3. Supposing him to be an alien in 1802, is there any thing particular in his case to exempt him from the general incapacity of aliens to inherit land?
First. What was his situation between the commencement of the Revolution and the treaty of peace?
He was an officer of the king's government, a member of the council, and colonel of the militia, and without doubt under a positive oath of allegiance.
He never owed natural allegiance to the state of New-Jersey. When the Revolution was proposed, he had a right to chuse his side. 1 Dall. 53, Chapman's case, which was decided even in the very heat of the Revolution.
*285 He did chuse to adhere to the British. The record states that he removed to Philadelphia before or while it was in possession of the British, and has adhered to them ever since. He never took the oath of abjuration of the king of Great-Britain, or of allegiance to the United States, or any of them; nor has he by any overt act exhibited himself a citizen of the United States or of either of them. His remaining in New-Jersey until he found a safe opportunity of joining the British, ought not, on general principles, to have bound him to any thing more than that local allegiance to which even foreigners are subject.
But it may be objected that in as much as he remained in New-Jersey till the year 1777, and the act of 4th of October, 1776, (2 Wilson's Jersey laws, 4.) declares that all persons then abiding there, not only owe allegiance, but are members of the then government, it must be concluded that he was a citizen.
I shall not deny the right of the state of New-Jersey to take such precautions as they thought proper for the public safety; but at all events their object was no more than to deter persons from joining the enemy during the war, under fear of death, and loss of property.
They who joined the enemy were a class of people whom they did not wish to receive again, as citizens. They could have no objection to their being aliens after the war. All such persons (provided they were convicted of treason, or had forfeited their estates,) were forever excluded from offices of trust or profit, civil and military, and from voting at elections of representatives, &c. by the act of 11th of December 1778, 2 Wilson's N.J. laws, 75, § 23.
All these objects are answered by preventing Daniel Coxe from chusing his side after the 4th of October, 1776. Accordingly Daniel Coxe was proceeded against with a view to the confiscation of his property, but he was never attainted. The same proceedings might have been had against an inhabitant of New-Jersey who joined the British between the 19th of April, 1775 and 4th of October, 1776; or even against an inhabitant of another state who *286 owned property in New-Jersey. Act of 11th December 1778, 2 Wilson's N.J. laws, p. 67, § 2. and p. 68, § 3.
Granting, then, the most that can be asked, that Daniel Coxe could not divest himself of his allegiance during the war, we cannot infer that the same impediment existed after the war.
This brings us to the 2d consideration.
2. What was the situation of Daniel Coxe from the peace to the year 1802?
The act of 4th October 1776 only declares those persons to be subjects who were then abiding there. All danger being over by the treaty of 1783, a new æra began, when every man had a right to leave the country and transfer his allegiance where he pleased. This is a most important right; and although Daniel Coxe now disclaims it, he would then have thought its denial cruel and unjust.
Of all people the Americans are the last who ought to call in question the right of expatriation. They have derived infinite advantage from its exercise by others who have left Europe and settled here. It is denied by the constitution of no state, nor of the United States.
It is positively affirmed by the constitutions of some of the states, viz. Pennsylvania, Kentucky and Vermont, and by an act of assembly of Virginia.
The right is also asserted by the best writers on the laws of nature and nations. Vattel, b. 1, c. 19, § 218, 223, 224, 225, &c. 1 Wyckefort, (L'Embassadeur et ses fonctions) 117, 119.
The same right is also asserted by our own authors, 1 Judge Wilson's works, 311 to 317. 2 Tucker's Bl. appendix, 426, (in a note) id. Vol. 1, part 2, appendix, 96.
It is also recognized by our courts of justice. 3 Dall. 153, Talbot v. Janson. And the case of the Charming *287 Betsy, in the circuit court of Pennsylvania, 26th May 1802.[*]
It has also been recognized by our government who have received and accredited in public characters from England, many persons who resided in the United States, at the time of the revolution, viz. Sir John Temple of Massachusetts, Phineas Bond, esq. of Pennsylvania, T.W. Moore, esq. and Col. T.H. Barclay of New-York.
In the commissions of all these persons, they are said to be of London, or some other place in the English territories.
It has been also recognized by our legislature, who in their act of naturalization insist on persons coming from Europe renouncing their former sovereign.
It is recognized by England where other nations are concerned. They formerly allowed naturalization in their colonies after seven years residence. They allowed it to officers serving four years in the royal American regiments, and they now allow it to persons serving three years in their navy.
Supposing then that Daniel Coxe possessed this right of expatriation, does it appear by the record that he exercised it?
If he did not, it is impossible that any person ever can.
To prove that he did, his conduct during the war is very natural.
The offices he held at Philadelphia and New-York shew that he risked his life and fortune with the British. If he was not then a British subject it was because the act of New-Jersey of 4th October 1776 estopped him from that right. Nothing on his part was wanting. After the peace he removed with his family, and has remained in England, openly avowing himself a British subject ever since.
*288 But to be more particular.
1. He has carried on trade and commerce as a British, not an alien merchant. On this head the British are extremely jealous; none but bona fide British subjects enjoy this privilege. No American post-natus is allowed to hold a ship under the British navigation act; nor to trade to the British colonies, except under great restrictions; nor to be exempt from alien duties; nor to hold East-India stock.
2. He has been pensioned not only for his losses, but for his loyalty and attachment to the British government.
3. He did in 1795, or afterwards, apply as a British subject to the commissioners under the 6th article of the treaty of 19th November, 1794, and in his petition asserted that he then was, and from his birth ever had been a subject of the king of Great-Britain, under the allegiance of the said king.
This treaty agrees to make compensation on the part of the United States to British subjects who have lost their debts by legal impediments.
Daniel Coxe might have returned to New-Jersey after the peace and become a citizen by taking the oaths, &c. The attainder in Pennsylvania was no hindrance, for the treaty of peace protected him from prosecution.
Thirdly. Let us now examine whether the alienage of Daniel Coxe is attended with any particular circumstances enabling him to take land by descent, contrary to the general principle of alienage.
On the execution of the definitive treaty of peace, the United States and Great-Britain were separate, independent governments. In that treaty ought to have been inserted any stipulation which the two nations wished to make touching the right of property to be held by individuals. And they have made some stipulations touching debts, and property both real and personal, but they were all confined to the security of property then held.
*289 With regard to lands there was to be no restitution; but Congress were to recommend restitution without condition. 1st. To real British subjects. 2d. To persons resident in districts held by the king, and who had not borne arms against the United States. As to all other persons, they were allowed to go to the United States and remain 12 months to endeavour to get back their property, and Congress were to recommend restitution, they paying the possessors the bona fide cost. There were to be no future confiscations, nor was any person to suffer any future loss or damage, in his person, liberty or property.
By the treaty of 1794, British subjects who then held lands in the United States, were, so far as regarded such lands, not to be considered as aliens; but they, their heirs and assigns, were permitted to hold, enjoy and dispose of the same, in like manner as if they were natives.
The general principle, that aliens cannot hold lands, has been adopted by New-Jersey; but by an act of assembly of 14th November, 1785, they have made an exception in favour of mortgagees.
But it is objected that the constitution of New-Jersey, having adopted the common law of England, has adopted also the doctrine of antenati.
The adoption of the common law was to secure the liberty and property of the citizens of New-Jersey, without regard to foreign nations, and not with a view of enabling British subjects to hold lands in that state. It was not meant to adopt those parts which were inconvenient, or inconsistent with our situation  such as that the king can do no wrong  personal and perpetual allegiance, &c. Besides, the constitution of New-Jersey expressly excepts such parts as are inconsistent with the rights and privileges contained in that charter.
Now that charter is at variance with the principle of antenati, which is founded on the basis that natural allegiance cannot be shaken off; whereas the constitution of New-Jersey declares that protection and allegiance are reciprocal.
*290 This doctrine of antenati is founded on Calvin's case, which was determined 6 Jac. 1. when the ideas of the royal prerogative were extravagant and absurd. The authority of that case is much shaken by the many absurdities it contains. Some of its principles are ridiculous, some contrary to the present law of England, and some contrary to our own constitutions. As instances of the ridiculous, may be cited his 4th union, which is of the three lions of England and that of Scotland quartered in one escutcheon  that Moses was the first reporter  that all infidels are devils and perpetual enemies of christians One of the doctrines contrary to the present law of England is, that natural allegiance cannot be altered by the law or constitution of man, but is something celestial  de jure divino. Witness the English revolution of 1688. The same doctrine is also contrary to our constitutions. Witness our own revolution;  the preamble to the constitution of New-Jersey;  and the naturalization law which requires an oath of abjuration.
Woodeson, vol. 1, lect. 14, p. 382, says, "when the "king by treaty, ratified by act of parliament, cedes a "country to another state, the inhabitants, though born "under his protection, become effectually aliens, or liable "to the disabilities of alienage in respect to their future "concerns with this country; and similar to this I take "to be the condition of the revolted Americans, since the "recognition of their independent commonwealth."
An alien may take by purchase or devise, but not by de cent; and this is the case even with a denizen. Vaughan 278, Craw v. Ramsay.
What is the situation of the people of Louisiana? They have been transferred from England to Spain  from Spain to France  and from France to the United States.  To whom do they owe allegiance?
The incapacity of aliens to hold lands is founded in public good and convenience. By suffering them to hold lands, the revenues will be transferred to strangers; population is prevented  and the state is deprived of the personal services of the landholders.
*291 But it is said we should act upon principles of reciprocity. That the British allow us to hold lands in England upon the principles of curtesy. If their decisions have proceeded upon those principles, it is no reason why we should allow the British to hold lands here. It may be their policy to maintain the principle, but it is not ours. They had fifteen millions of inhabitants, we had only three. It was their interest to secure their claims on this country by mortgages and purchases of lands. But our courts cannot decide upon such principles. But if their decisions are founded in law, there was no use in the stipulation of the treaty respecting the right to hold lands. It is only by admitting that the inhabitants of the two countries were aliens to each other, that any effect can be given to the treaty.
The principle of natural allegiance does not apply as to this country. No antenatus ever owed natural allegiance to the United States. There can be but one natural allegiance, and that was due to the king of Great-Britain. American antenati therefore may hold lands in England, because they were born under the allegiance of the king of England; but English antenati cannot hold lands in America, because they were not born under the allegiance of the United States.
It is said in Tucker's Blackstone, vol. 2, appendix, note C. p 54, that after the declaration of independence, according to the principles of the laws of England, which we still retained, the natives of both countries, born before the separation, retained all the rights of birth, i.e. of inheriting lands, &c. yet the preamble of the Virginia act concerning escheats, &c. passed May 1779, 2 Tuck. Bl. append. p. 54, asserts that on the separation of the United States from the British empire, the inhabitants of the other parts of the empire became aliens and enemies to the said states, and as such incapable of holding the real or personal property which they had before acquired in the United States.
We say then upon the whole, 1st. That Daniel Coxe was always a subject of the king of Great-Britain, and never was a subject or citizen of the state of New-Jersey; and, 2dly, that if he was by force a subject of New-Jersey, he had a right, when that force ceased to *292 operate, to return to his natural allegiance, and shake off the compulsory allegiance which had been forced upon him by the state of New-Jersey, and which he always refused to acknowledge  and that he has done so. And lastly, that whether he was always an alien as to the state of New-Jersey, or whether he is to be considered as an expatriated citizen, he is still an alien, and therefore incapable of taking lands by descent.
Paterson, J. Suppose he expatriated himself since the peace, what is the consequence? Does he thereby become a complete alien, so as not to be capable of taking lands by descent afterwards?
W. Tilghman. So I contend.
Rawle, contra. The title of John Rodman Coxe is good, unless Daniel Coxe his father, was disabled to take by descent from his aunt Rebecca Coxe.
But he was incapable of taking unless,
1. He was an alien; or
2. Attainted of treason.
The latter is not found by the jury. He was, therefore, not attainted, nor incapable by reason of any crime.
That he was not an alien, I shall endeavour to demonstrate.
1. Every inhabitant of a state became, at the declaration of independence, a citizen of such state; so far at least as relates to the right of holding real estate.
2. He thereby owed allegiance to such state, and acquired capacity to take and hold lands in it.
3. Of this allegiance he could not divest himself. Of this capacity he cannot be deprived, except in the course of punishment for crimes.
If allegiance be considered as a contract, which requires the consent of both parties to make, it cannot be dissolved but by the consent of both.
*293 1. The first position is laid down in a qualified manner, because, it is unnecessary to take a wider scope than the nature of the question requires. It is unnecessary to consider the entire doctrine of allegiance, and its incident, treason.
The fullest extent to which I shall press this first position, is, that prior to the declaration of independence we were all British subjects, and as such had the capacity to take and hold lands throughout the British empire. That the renunciation of allegiance, the change of government, did not divest of that right, even those individuals who in no shape recognized or adhered to the new government. 1. Because it was not implied from the nature of the revolution, and 2, because it was necessary to its safety or success.
In the formation of a new government or society, the acts of the majority (what Rutherford, Vol. 2, p. 18, calls the natural majority,) bind the whole.
The members comprising the major part, are citizens by choice  The minority by force. It did not authorise the majority, to seize the property of the minority. They were all members of the new state.
But by the opposite argument, the immediate effect of the revolution was, to commit the grossest injustice on the minority; to deprive them of their possessions because they differed in opinion: to render them aliens, and divest them of their lands.
Such intentions were not declared.
The independence of America was a national act. The avowed object was to throw off the power of a distant country; to destroy the political subjection; to elevate ourselves from a provincial, to an equal state in the great community of nations.
It was therefore a political revolution, involving in the change all the inhabitants of America; rendering them all members of the new society  citizens of the new states.
*294 The declaration of independence was not an unanimous act. It was the act of the majority. But the general sentiment of the day, was that it bound the minority. They were all equally considered as citizens of the United States. This principle was never questioned. The minority were never considered as aliens. Hence the penal laws of that time made by the states, consider some of that minority as traitors.
Such intentions were not implied.
The people of the colonies were absolved from allegiance to the British crown. The political connection between the people of America and the state of Great Britain was dissolved; and in the language of the declaration of independence, the right "to levy war, conclude peace, contract alliances, establish commerce, and do all other acts which independent states may of right do," was solemnly asserted, and publicly established.
To this distinguished act in the history of man, the assent of the people was essential. That assent was implied from the assent of the majority. The assent of the people, could only be known by the assent of the states. Not a state dissented.
New-Jersey was first. Her independent form of government, was adopted on the 2d of July 1776. But the division of the people who composed the states, and the disfranchisement of any part of them, were not necessary consequences of that assent. Every inhabitant continued a member of the society. Every inhabitant, therefore, continued to retain his property, whether real or personal.
But each individual state had to form its own government, and establish its own rules. We must, therefore, seek for those rules in the Constitution of New-Jersey.
The 1st, 2d, and 3d articles organize the legislature, (which by the 7th, is to choose the governor,) the 4th and 13th, expressly vest the power of choosing officers in the inhabitants, who have resided in the county for 12 months, and who have property to a certain value. Thus the inhabitants without distinction, are made members of the society, citizens of the state. Being citizens, all the *295 rights of acquiring and enjoying property, attached to them.
But Daniel Coxe was then an inhabitant. Will it be denied that he then was a member of the society? that he could then hold lands?
The legislature of New-Jersey, assembled on the 27th of August, 1776, and on the 4th of October, passed a law which must remove all doubt on this part of the subject. Every person "abiding" within the state, and deriving protection from its laws, is declared to owe allegiance to it, and to be a member of it.
But every man who abode within the state, received protection from its laws. It is found by the special verdict, that Daniel Coxe did at that time abide within the state; he therefore owed allegiance to it, and was a member of it.
The inquisitions found by the jury, were founded on two acts of assembly of New-Jersey. By those acts it will appear, that the objects of such proceedings were, and only could be, persons owing allegiance to the state. The act of 5th June 1777. (Wilson's Edition of New-Jersey Laws, appendix p. 5,) offers a pardon to "such "subjects" of the state, as had been seduced from their allegiance to it, and had joined the enemy; and enacts that if they did not return by the first of August, their personal estate should be forfeited, and that if perishable, or likely to fall into the hands of the enemy, it should be sold. The alienation of it by such persons, was declared to be void. But it did not forfeit the real estate.
This law speaks of their returning to their allegiance, not as alien enemies, but as offending subjects.
The first of the two oaths, required by that act, is in these words. "I A.B. do sincerely profess and swear, "that I do not hold myself bound to bear allegiance "to the King of Great Britain. So help me God."  The second oath is "I A.B. do sincerely profess and "swear, that I do and will bear true faith and allegiance *296 "to the government established in this state, under the "authority of the people. So help me God."
The effect of taking these oaths was a pardon, and restoration to the rights of a subject; not a naturalization as new subjects, but restoration "to all the rights of other the good subjects of this state."
The subsequent acts, prescribing the form of inquest, &c. refer to this act, and are founded upon the delinquency or treason of the offenders.
Many of the objects of that law, having failed to avail themselves of its offered clemency, the act of 18th of April 1778, was passed. (Wilson's Laws of New-Jersey, p. 43.) This law was founded on the last, and expressly refers to it. By this act the real and personal estates of such persons, are to be taken into possession; the personal to be sold, and the real to be rented out.
The preamble is in these words:
"Whereas many of the offenders mentioned and described "in an act of free and general pardon, and for "other purposes therein mentioned, have neglected to avail "themselves of the benefit thereof. Therefore be it "enacted," &c.
The next act of assembly is that of 11th December, 1778. By this act the estates of such "fugitives and offenders" as are in the other acts described, are forfeited.
The first section relates to such fugitives and offenders, i.e. to inhabitants owing allegiance, &c.
The second section that every inhabitant of the state, who between the 19th of April, 1775, and the 4th of October, 1776, joined the enemy's army, or took refuge, or continued with them, or endeavoured to aid them by counsel or otherwise, and hath not since returned and become a subject in allegiance to the present government, by taking the oaths, &c. of allegiance, is declared guilty of high treason.
*297 This, however, does not reach the case of Daniel Coxe, who did not join the British army until the year 1777.
By the third section every person, not an inhabitant of this state, but of some other of the United States, seized of real estate, who since the 19th of April, 1775, aided or assisted, &c. as before stated, is declared guilty of high treason against the state of New-Jersey.
In both cases an inquisition finding the facts is declared to amount to a forfeiture of the offender's real and personal estate; and in both cases it is declared that such conviction shall not in any instance affect the person of any such offender.
It is therefore only and uniformly in respect to allegiance, to a breach of the duties of a citizen, to the state of New-Jersey or other of the United States, that the real estates are forfeited; and no authority can be collected from any of the laws, to proceed against real estate held by an alien; at least it is obvious that no such proceedings as are directed by these laws could be supported against an alien, merely as such.
2. That as a recognized inhabitant, as a member of the civil society, and a person owing (and permanently owing) allegiance to the state, he could hold lands within it, is a position too plain to be disputed.
The rule of the common law is that all persons may hold lands, except aliens. 1 Bl. Com. 371.  2 Bl. Com. 249. But Daniel Coxe was not an alien. Daniel Coxe, therefore, may hold lands.
These two positions are supported by the collateral effect of the treaty of 1783. The 5th article recognizes the capacity of all persons, who have been the subject of judicial proceedings, to hold lands. Congress are to recommend to the legislatures of the several states, to pass laws authorising those persons who had adhered to the British cause to return to America, and there remain for 12 months, to obtain restitution of their estates.
In each case, therefore, the right to receive, and with it the right to retain and hold lands, are recognized; for *298 it would be absurd to suppose that he who is to receive it by virtue of the treaty, is immediately afterwards to have it wrested from him, as an alien.
On the subject of restitution, Congress were only to recommend, but on another, the treaty is peremptory.  By the 6th article there were to be no future confiscations. As a part of the former proceedings, or connected with them, the treaty removes that obstacle to the plaintiff's recovery; for the inquisition could only operate on what Daniel Coxe was then seized of or entitled to.
It is contended by the opposite counsel that the treaty authorises to hold only such lands as could be restored, not to hold new acquisitions.
But if our own laws could recognize a person as a citizen in part, and an alien in part, yet the 6th article gives them the right to hold new acquisitions as well as to retain what they held before. But the effect of the 9th article of the treaty of 1794, is still more extensive. It goes to exclude escheats pro defectu sanguinis. Neither they, nor their heirs, or assigns shall be considered as aliens. If Rebecca Coxe had been a British subject, the plaintiff below could have claimed under her by virtue of the treaty. Shall he not then inherit because she was a citizen of the United States? By the treaty of 1783, antenati could retain lands in both countries. That of 1794 provides also for postnati. Antenati may not only hold, but pass lands to postnati.
3. The third position embraces two divisions.
1. Allegiance.
2. Capacity to hold and transmit laws.
1. Daniel Coxe could not by his own act get rid of the allegiance he owed to New-Jersey.
2. He could not, except in the case of punishment for crimes, be deprived of his capacity to hold.
This point might be carried still further; and it may be contended that if he had expressly endeavoured to divest *299 himself of a capacity to take and hold lands, yet his heirs, being citizens of the United States, might claim under him. But this is not now necessary. It is sufficient to shew that as he denies any disclaimer of his capacity, so he cannot, by the interested views of his present opponents, be deprived of it; for the opposition is not now made by the state, but by private individuals who endeavour to blot him out of legal existence that they may double their portion of the inheritance.
It is a principle of the common law (which law is expressly adopted by the 22d section of the constitution of New-Jersey) that no man can put off his allegiance.  Hale, H.P.C. 68. 1 Bl. Com. 369. Forster's cr. law, 59. M'Donald's case.
It is true that Blackstone speaks of that allegiance which is coeval with birth; distinguishing it from local allegiance, arising from temporary residence.
But the allegiance due from Daniel Coxe was not of the latter kind; it did not arise and terminate with his residence in New-Jersey. It sprung from his inhabitancy in New-Jersey, when it created itself a state; from his being then, in common with all around him, a subject of the king; from the change which those around him, in the course of successful resistance, made in the form of their political society, by acts in which the majority must compel the acquiescence of the smaller number. That the minority were bound by the acts of the majority, was decided by Ch. J. Ellsworth in the circuit court in North-Carolina, in the case of Hamilton v. Eden.
Birth is but evidence of allegiance. At the time of a revolution residence is equally evidence of allegiance to the new government. Indeed it is stronger if the person be of mature age. It may at least be considered as a new birth.
It was natural allegiance; as society is natural to man, and allegiance is natural to society.
But without playing on the word, it may be characterized as permanent allegiance; the opposite of temporary.
*300 It is said that he never was to be considered as a citizen of New-Jersey, or if he was, that he expatriated himself.
1. That like Chapman, he made his election before any new government was formed, and on the dissolution of the old one; and therefore never was a subject of the state of New-Jersey. But the distinction between these two cases will be wide and glaring.
Chapman left Pennsylvania the 26th of December, 1776; Coxe not till September, 1777. Chapman was acquitted because he had left the state before the 11th of February, 1777, on which day the laws of the then late province were to be revived, according to an act passed on the 28th of January, 1777; and on which day the act passed declaring what should be treason, and that all persons now "inhabiting, &c. within the limits of the state of Pennsylvania, "do owe allegiance," &c. It was therefore declared that he was not a subject at the time of his quitting the state of Pennsylvania; and the attorney-general having averred that he was a subject and inhabitant of the commonwealth, it was held that the issue was not maintained on his part. If Chapman had resided in the state on the 11th of February, 1777, he would on the very principles of his own defence, have been been liable to indictment.
But Coxe was an inhabitant of the state of New-Jersey or the 4th of October, 1776, when a declaratory law, similar to that of Pennsylvania was passed. After which it was too late for him to attempt to change sides. He was then fixed as a subject, and liable to indictment for treason. Being thus, on the one hand, subject to the penalties resulting from his civil relation to the commonwealth, he is, on the other, entitled by natural and equal justice to the benefits of that relation.
[W. Tilghman admitted that by the law of New-Jersey, Daniel Coxe was to be considered as a subject of New-Jersey by force; and that the state had a right to make such a law. He had argued only upon the general ground, independent of the law of New-Jersey.]
Rawle. It is admitted then that he could not make his election until the peace of 1783. It was the first time he *301 ever heard that after an arduous conflict has successfully terminated by means of the energy and exertions of a majority of the people, each individual of the minority had a right of election which should look back and give a new aspect to his conduct through the period of the struggle.
[W. Tilghman stated that he did not contend for such an election, but that all the citizens of the United States, after the peace of 1783, had a right of expatriation, and Daniel Coxe among the rest.]
Rawle. Let us then consider this supposed expatriation, this imaginary dereliction of his country and his rights, this abjuration not only of allegiance, but capacity to inherit, which is to operate against him as a political estoppel; or like the ancient confession of villenage, is to deprive him at once of all power to take by descent or purchase.
It is perhaps a sufficient answer to say that expatriation is a fact which ought to be found.
Our opponents have piled together a confused and shapeless mass of evidence, on which this court cannot act.  Since even if expatriation had been allowed by the constitution or laws of New-Jersey, all the different facts put together would not amount to the technical fact of expatriation; and since if expatriation be not allowed, they are of no more importance than finding whether Mr. Coxe wore a blue coat or a brown one.
The circumstance most relied upon to prove Daniel Coxe's expatriation, is his carrying on commerce as a British subject. In this respect there has been a liberal construction of the rights of citizens of the United States in the British courts, even as to their navigation act.  They have, for the purposes of commerce, held that a person might be a British subject as to his duty of allegiance, and a citizen of the United States as to his commercial character. Thus in the case of Marryat v. Wilson, 1 Bos. and Pul. 430, 444, it was held that "both characters may stand together," and so in all cases so far as there are no conflicting duties, a man may be a subject of many different governments, and may enjoy the benefits conferred upon him by all. The right of Daniel Coxe to hold land *302 in New-Jersey does not conflict with any duty which he owes as a British subject. His becoming a subject of Great-Britain therefore, as to purposes of commerce, is not evidence that he had renounced his rights as a citizen or subject of New-Jersey. Nor does it follow, because he is a British subject that he is not also an American citizen. 1 Bl. Com. 369, 376.  3 Dall. 169, Talbot v. Janson.
What then is expatriation? It is said to be an operation by which a citizen is made an alien. And it is contended that although Daniel Coxe was once a citizen of New-Jersey, it was against his will, and that the moment he had it in his power by the peace to throw off that character, he did it, and by becoming a subject of the king of Great-Britain, he became an alien to New-Jersey, and therefore not capable of taking lands by descent, in that state.
Many of the writers upon this subject have confounded expatriation with emigration; and hence has resulted great confusion. But the ideas are very different and distinct.
Expatriation is a matter of municipal regulation.
Emigration is of right. It cannot be restrained without injustice and even violence. Expatriation cannot be effected without public consent.
Expatriation dissolves the original obligation of the citizen.
Emigration only suspends its activity.
Expatriation incapacitates from taking lands in future.
Emigration retains that capacity.
Expatriation renders the future issue aliens. Emigration does not impair the right to be received as citizens.
Expatriation is an inconvenient and inflexible deprivation.
*303 Emigration destroys no rights, but facilitates the commerce and improvement of man.
Hence in no states, not depressed by the severest despotism, is emigration prevented. In very few is expatriation even known.
Of the 17 United States, one only (Virginia) has recognized or provided for it by law. In the constitutions of the other states, which have been cited, it is the right of emigration only which is protected, and not a word is said of expatriation. In the laws of Great-Britain there is no such term, or idea, as expatriation. It is altogether unknown.
As soon as a man has expatriated himself, his lands would escheat, and he would be divested of all the rights of a citizen. There has been yet no case in practice where the lands of an expatriated citizen have been escheated.
It is inconsistent with the nature of expatriation, that the party be permitted to retire from the community for purposes hostile to its welfare. No citizen can expatriate himself for the purpose of committing an act which would be treason, without such expatriation.
There ought also to be some municipal regulation defining the evidence and the mode, and declaring the assent of the government. 3 Dal. 133, Talbot v. Janson.
If Daniel Coxe had set up this defence on an indictment for treason, it would not have availed him.
If then his liabilities, on the one hand, and his rights on the other remained in full force at the time of his departure; if he took with him the capacity, as well as the responsibility of a citizen; are the subsequent events of his life to act retrospectively on his departure, and tear asunder the ties which bound him in 1777?
If such an effect can arise from these causes, the quo animo, the intention, ought to have been found, especially as it is a recognized principle that a man may owe allegiance to two countries at the same time, and therefore *304 may lawfully have the intention of owing allegiance to both Great-Britain and New-Jersey. The court cannot decide that it was with intent to expatriate. 7 Co. Calvin's case, 27, (a and b.). 2 Tucker's Blackstone, appendix, 53. Kirby's Reports of cases Sup. Court, Connecticut, p. 407. Apthorp v. Backus.
The counsel for the plaintiff in error have divided their case into three questions, according to three periods of time, in the solution of which they have employed much ingenuity.
1. From the beginning of the revolution to the peace of 1783.
This period seems to be nearly conceded; at least it is admitted that the state had a right to compel the inhabitants to become members of the new state or society. It seems to be admitted also that there is a sufficient finding of his residence in New-Jersey till 1777, to bring him within all the laws of that state. The test laws of 1778 could not have influenced his departure in 1777; nor did they give him any right to dissolve the connection; because the penalties imposed were the consequences of political offence; the punishment of treasonable flight. And to suppose that a man, by staying away to avoid the punishment of the law, had a right to dissolve the obligations of the citizen, is to lay down a principle tending to shelter every fugitive from justice.
It may be noticed that incapacity to hold lands is not among the penalties annexed to his disaffection. There are two legislative declarations:  1. By making him a citizen and thereby giving him the capacity. 2. By imposing other penalties on the offence, but reserving this capacity.
It has been said that the object of the New-Jersey laws was merely fiscal. But the citizenship of Daniel Coxe does not depend on the inquisition, but on the act of 1776; i.e. he would have been a citizen by virtue of that law, although no inquest had been taken against him.
*305 It has also been said that the act of 1778 includes those who had offended against other states, and had never been inhabitants of New-Jersey, and therefore the legislature did not mean to compel them to become citizens. The answer to this objection is found in the case of Camp v. Lockwood, 1 Dall. 393, in which the offence was decided to be an offence not only against the particular state, but against all the states.
2. The 2d period is from the peace to the time of the descent cast in 1802. And it is contended that in 1783 Coxe had a right to make his election and choose his country.
But this position is attempted to be supported on a false basis. No such right is mentioned in the treaty. On the contrary the 5th and 6th articles manifest a mutual understanding that the loyalists were to return home, to obtain restitution of their estates, intimating plainly that if they could obtain restitution they would be entitled to hold.
3. The provision of the treaty, "that there shall be no future confiscations," settles the point of a capacity to take at present, and not in future. It was the universal understanding that a sale after the treaty, of property before confiscated, was no breach of the treaty. How then can there be a future confiscation but in consequence of a future taking? And he who can take in future is not an alien.
Daniel Coxe, who ought to know the quo animo of all the acts charged against him, declares by his counsel, that he never meant to give up his capacity to take and hold lands by descent or purchase: and his counsel declare that if such was his intention, he could not do it. These are two distinct propositions, both of which must be established by our opponents. They must prove not only the will but the power.
But it is said to be a hardship to deny the right of expatriation.
*306 The observations made upon this point apply only to emigration, and the right to emigrate is not denied.
But when a man turns his arms against his native country and ungratefully endeavours to destroy the hand which fostered and fed him, the arm of justice, though severe, is not misdirected.
And if in the decline of life he wishes to return to the bosom of his surviving friends, and be buried in the tomb of his ancestors, is he to be received only as an alien and an outcast  as a modern citizen of the world  a detached, rotatory, irresponsible and useless being?
Inconsistency runs through the whole of the argument for the plaintiff in error. The counsel contend for the rigid doctrine, peculiar to feudal tenures, that an alien cannot hold land, and yet discard the more rational concomitant feudal principle, which has been engrafted into the comr on law, that nemo potest exuere patriam.
The authorities which have been cited do not support the principles contended for by the plaintiff's counsel.
All the American constitutions which have been referred to, speak only of emigration. Virginia alone has provided by law for the case of expatriation; but that law cannot affect lands in New-Jersey.
Vattel speaks only of emigration.
Judge Wilson uses only the same expression, and gives his opinion of what the law ought to be, not what it is. It is said too that he decided a case in Virginia, of a claim under Lord Fairfax, upon principles contrary to those contended for by our opponents.[*] So in the case of Apthorp v. Backus, Kirby's Reports 407, the *307 plaintiff was a British subject before the revolution, and yet recovered the land in the year 1788.[]
Wyckefort, reasons upon general principles, on the subject of expatriation; but expressly recognizes the law to be otherwise in England.
*308 In the case of Talbot & Janson, the court was of opinion, that the right could not be exercised without an act of the legislature.
The case of the Charming Betsy, in this court at the last term, did not decide the present question. For the question now is, whether, by becoming a subject of another sovereign, he is to all intents and purposes an alien.
Woodeson, probably means only postnati of America, if he had any clear idea at all upon the subject.
February 18. Stockton on the same side.
There is but a single objection to the title of the lessor of the plaintiff, which is that D.C. under whom he claims, was, before and at the time of the descent and conveyance, an alien, and therefore could neither receive nor transmit any estate in the premises in question.  This I shall deny: 1st. Because D.C. was born under the same ligeance with the other subjects of N. Jersey. 2dly. Because the legislature of N. Jersey, after the organization of their independent government in the exercise of constitutional powers, derived from the people, by statute declared him a subject of the new government; exacted from him the duty and submission of a subject, and punished him for a breach of his allegiance  but never deprived him of his capacity to inherit real estate. 3dly. Being thus once a subject of N. Jersey, by the constitution and law of that state it was not in his power to make himself an alien; and if it had been in his power he did not exercise the right.
1. Lit. sec. 198, defines an alien to be "one born out of the ligeance of the king," and he adds, "if he sues an action real, the tenant may say that that he was born in a country out of the king's ligeance." This is the universal form of pleading alienage. The defendant must shew that the plaintiff was born out of the king's ligeance and where. The definition of Littleton, taken from writers still older than himself, has been adopted by Vaughan, Hale, Foster, and Blackstone, indeed by all the English lawyers, and has never been questioned. The form of pleading is equally ancient, and both together, present a complete criterion of the law. That the place of *309 birth should determine the condition of the subject, is both reasonable and natural. It is reasonable, because he there receives the protection necessary to the preservation of life, during the helpless years of infancy  an obligation which can be conferred on him by no other country  because, there it is that he is immediately invested with all the privileges derived from society and government  giving him the force of the community to protect him in his rights of personal liberty, reputation and property, and at a time when he could make no return. How reasonable is it then that he should owe to such a country, the corresponding duty of allegiance? It is natural, because there exists in every good man, a virtuous principle of preference for that country, nay, for that spot, where he first drew his breath  where he passed his childhood  where his mind first opened to the endearing relationships of life, which nothing but the hand of death can extinguish  an amor patriæ, which remains in spite of rejection, persecution and punishment, and which, even amidst the conflict of the passions produced by a sense of injury, still secretly leads him to his native country as his resting place. The common law, founded in reason and nature, therefore, proclaims that no m n born a subject can be an alien. But it is said, that D.C. was not at the time of his birth, a subject of the state of New-Jersey, and therefore may be an alien.  Answer. At the time of his birth, the king of England was the common sovereign of D.C. and the other citizens of New-Jersey; and by the principles and express rule of the common law, such persons never can be aliens, though a change of sovereigns should take place, and distinct governments be formed; for as on the one hand, the duty of natural allegiance accruing at birth, adheres to him through life  so on the other, the corresponding privileges, among which is the capacity to take and hold lands, must remain, unless forfeited by crime. The very point of Calvin's case, independently of the reasoning of Lord Coke proves this. There the antenati of Scotland were held aliens in England, though James was sovereign of both countries, because, at the time of their birth they were aliens. So on the other hand, the postnati were declared subjects, and it was held that they always must be considered subjects, because they were subjects at the time of *310 their birth. In 7 Coke, 27, b. Lord Coke puts the very case: "Wherefore, to conclude this point (and to exclude all that hath been or could be objected against it) if the obedience and ligeance of the subject to his sovereign, be due by the law of nature, if that law be parcel of the laws as well of England as of all other nations, and is immutable, and that postnati and we of England are united by birth-right, in obedience and ligeance (which is the true cause of natural subjection) by the law of nature; if followeth, that Calvin, the plaintiff, being born under one ligeance to one king, cannot be an alien born."
This is not then to be considered as one of the extrajudicial and fanciful reasons of Lord Coke, of which so much has been said, but a consequence not only clearly flowing from undoubted principles, but adopted by ancient practice, and proved by the history and law of England. Such was the condition of those provinces of France, claimed and held by the kings of England. These were subject to continual revolutions and change of sovereigns, as the arms of either king prevailed; but Frenchmen, born while the kings of England were in possession, were held not to be aliens when that possession ceased, and might hold lands in England. 7 Coke 20. b, is express to this purpose, and in 2 Viner. 261, pl. 11, it will be seen, that this doctrine was considered as law by other judges. It has indeed been said, that Calvin's case is not law, and his reasoning has been stated to be servile and ridiculous. That it partakes largely of the quaint pedantry of the times, is not to be denied; but that my Lord Coke would lay down, and take such pains to prove a false position of common law, comports not with his character, either as a lawyer or a man; and the case of the commendams is of itself enough, to rescue his character from the imputation of undue servility. Besides, the determination in Calvin's case, has never been overruled or questioned; it is supported by the names of the venerable Fleta, Bracton, & Britton. It received the sanction of Lord Chief Justice Vaughan, (Vaughan's Rep. 285,) of Lord Hale, as may be seen in his history of the pleas of the Crown; and in 4 Term Rep. 308, the same doctrine is laid down as the modern law of Westminster-Hall, *311 by Lord Kenyon. This doctrine that the antenati should be capable of inheriting is founded in justice; a right once vested, ought never to be divested, unless it be for a crime. An empire is rent asunder by a revolution; the individuals of each territory may be innocent; if guilty, they can only suffer the punishment, annexed by law to the crime; it was impossible for Daniel Coxe to commit a crime against New-Jersy, which could destroy his inheritable blood, that being saved even on conviction of treason.
The opinion of the most celebrated jurist of our country, is, expressly in favour of my position. Judge Tucker, in his notes on Blackstone, not only considers the rule in Calvin's case to be law, but applies it to the antenati Americans, who he says may hold lands in both countries. 2 Tucker's Black. Appen. 53, Note c. But it is again said by our learned adversary, that this doctrine of the common law, is derogatory to the feelings and character of freemen, and altogether inconsistent with our present forms of government, and political institutions; it is, however, conceived that this doctrine contains in it no principle of the nature ascribed to it, and that its results are especially applicable to our political system. What is the injunction of the common law? not that a man shall, like the trees of our forests, be planted and affixed to the place where he was born; not that he shall be prohibited from bettering his condition elsewhere; it restrains not the right of emigration under proper restraints and limitations: on the contrary, the subjects of this law, enjoy more liberty in this respect than all the rest of Europe. It only says to them, if you do emigrate, you shall still retain the privileges and be under the restraints of your natural allegiance.  What can be discovered in this derogatory to a freeman? No; it should rather be considered as an invaluable privilege; the price of a reasonable and prudent restraint. In it is only heard the voice of exalted Patriotism saying to her children, go gain your support, seek your happiness in fairer fields, in a more genial clime; but remember (and it is the only restraint I place you under) raise not a parricidal hand against your native land. The results of this doctrine appear to me peculiarly applicable to our political position. We are not a confederated republic. *312  Our general government is composed of a number of distinct and independent states, uniting under one head by mutual consent for common benefit. But an event may happen (which every good man should join with my Lord Coke in his devout prayer, "that God of his infinite goodness and mercy may prevent,")  time may come when this bond of union may be broken, this confederacy dissolved, and these sovereignties become altogether and completely independent. In this event what security would a citizen of one state have for his lands held in another, but this much reprobated maxim of the common law? With it all would be safe  we were once fellow-citizens  we owed allegiance to a common head  we never can be aliens. Without it our lands held out of the state in which we live, would be liable to escheat on the ground of alienage.
Let us not, affect to be wiser than the law. Let us not, for idle theories, absurd as well as impracticable, depart from those principles which have secured to our ancestors the complete enjoyment of their liberty and property.
2. But supposing that this doctrine of the common law that the place of birth does conclusively fix the character of a subject, should be considered as not applicable to the case of a revolution by which one part of a nation is severed from the other, becomes independent, and forms a separate government. We must then search ex necessitate for some other principle, as a substitute for the common law principle, and which shall denote who are and who are not members of the new community. Now, the natural, the only practicable substitute is this, that those residing at the time of the revolution in the territory separating itself from the parent country, are subject to the new government, and become members of the new community, on the ground either of tacit consent, evidenced by their abiding in such territory; or on the principle that every individual is bound by the act of the majority. Hence, as birth at the common law denotes the subject, so residence at the time of the revolution will draw with it the same consequence. The great men who conducted the revolution in New-Jersey were at no loss to discover this principle.  They recognized it by their constitution and first acts of legislative power. By law they claimed all men in the situation of D.C. to be their subjects. This brings me *313 to the second point which was, that D.C. could be no alien because the legislature of New-Jersey proclaimed him a subject, claimed his allegiance as one, and punished him as one for a breach of it, without, however, taking from him his inheritable rights. The new constitution was adopted in New-Jersey, July 2d, 1776. October 4th, Wilson N.J.L. 4. The legislature then first convened under it passed their treason act, in which it is declared "that all persons abiding within the state, and deriving protection from the laws thereof, do owe allegiance to the government of this state, established under the authority of the people, and are to be deemed members thereof." Then they go on and declare all such guilty of treason who shall adhere to the king of G. Britain  saving the corruption of blood. D.C. as the jury have found, was born in New-Jersey, was living and abiding in the state at that time, and adhered to the British by joining their army more than one year afterwards.
This description of who were subjects of the state of New-Jersey, was always closely pursued by the legislature and ended in the seizing and forfeiting the estates of all those who had withdrawn within the British lines, and so could not be attainted on trial, according to the course of the common law.
Wilson, N.J.L. Appen. 5, contains the next act  it is an act of free and general pardon. The former act had declared who were subjects, who could offend  this offers conditional pardon on their return to their allegiance, and forfeits the personal estate of those who did not accept proffered grace. Then follow the several acts of Dec. 8th, 1778, Appendix 8; of April 18th, 1778, Wilson, N.J.L. 43; of 11th Dec. 1778, in which the same description of subjects given in the first act is confirmed  provisions made to punish them if they persist in their rebellion to the state, which ends, and in this case did end, in the entire confiscation of the real and personal estate of the offending subject. It was observed on these acts, that they appeared to be rather of a fiscal nature than any other, and were not so much designed to prescribe duties, and punish transgressions, as to bring money into the treasury. Such an object would have been unjust and pitiful, and was never contemplated at the time they were enacted. No; the patriots of that day had a more sublime object. *314 Their great object was independence. By these acts they meant to legitimate the revolution by the supreme power of the people. They proclaim their new and republican government. They declare whom they consider as the members composing this new community. They proceed to impose the duties arising out of their new condition, and to enforce the performance of these duties by the sanction of adequate punishment for their violation. They did not, it is true, pass attainder acts affecting the person of the offender, because such acts were deemed inconsistent with their avowed principles. Such acts go to take the life of a man without trial by jury  to convict him of personal offences in his absence, against a maxim of the law. These obstacles did not exist in so strong a degree in proceedings in rem, which ended in punishment by loss of property. Fiscal considerations then had nothing more to do with this subject than they have with all other cases of crimes punished by forfeiture or pecuniary mulct.  They are but consequences of the crime, not objects of the law. The 2d. section of the last act which punishes treasonable acts between the 19th of April, 1775, when the civil war first broke out, and the 4th of Oct. 1776, when the treason act passed, it was said, was particularly subject to this objection; for it was urged, as this related to a period prior to the establishment of the new government, and before there was a treason act, there could be no other ground for the provision. I conceive the learned gentleman equally mistaken in this suggestion. It is well known in New-Jersey that government did not cease between these days. The people governed themselves in their primitive capacity by committees of safety in each county, and by a provincial congress. This congress did, in fact, pass an ordinance of treason soon after the war commenced, containing the same provisions with the treason act of 4th Oct. 1776. This section then referred to this notorious fact, and was designed to give the sanction of the legislature to the provisions of that ordinance.  And both this ordinance and this section of the act, contained in them nothing more than the principle acted on throughout the war, that Americans could at no period legally act against this country, but were bound to take its part from the first hour the sword was drawn. What then is the fair result of all these provisions? We see an old government dissolved and a new one created. The people at first, and their representatives afterwards, declare *315 by law all men abiding within their territory, subjects of the new government. They pass treason acts, define allegiance, and enforce its duties by the accustomed sanctions of the law. These laws operated on D.C. He was an abider within their territory. They claim him as a subject, and punish him for refusing to yield obedience. Shall, then, this same government, which with a voice of thunder proclaimed him a subject and punished him as one, or shall an individual under its laws now say to him, you are an alien? Shall he be declared a subject to punish him and an alien to punish him? A subject to take all he has, and an alien to prevent his acquiring any in future? Shall he be made poor by citizenship, and be kept poor for want of it? No, I apprehend not. The government, and all claiming through its laws, are estopped to say he is an alien, and no act of his, as I shall directly shew, would alter his condition. The legislature never meant to adopt such inconsistent and repugnant principles. They carried through their work correctly on their own plan. It is by pursuing now an opposite one on a scheme of private interest that the incongruity is produced. They had a right to declare the colonists members of the new government on the clear republican principle that the minority must yield to the majority. But they had no intention of going further by illegally taking from them their birth-right  their capacity to inherit lands. These laws also destroy at once the fanciful doctrine of election in case of civil wars. It may, for aught I know, be just enough to give men a free election in such cases to adhere to the old, or to join the new government. But then was the time to have acted on this magnanimous principle. The legislature abjured it; they declared by their treason act that no Jerseyman had an election to join against his country.
The learned counsel seemed to yield to the force of this conclusion so far as respected the period from the commencement of the war to the treaty of peace; but at the æra of the peace he says, Mr. C. had a right to continue a British subject, which he did, and so has become an alien. But we have shewn him to have once been a subject of the state of New-Jersey by their own concession; that is to say, from the commencement of the war to the treaty of 1783. This, then, opens to me the last point I propose to treat.
*316 3dly. D.C. having once been a subject of New-Jersey, it was not in his power, without the concurrence of New-Jersey, expressed by legislative act, to become an alien. And if he possessed the power he never exercised it.
The modern theory of expatriation has been relied on  nay, our adversaries seem to place their cause on it  a narrow point indeed whereon, in a common law court, to defend an ejectment! and what becomes of it when we reflect that the common law expressly prohibits this supposed right of expatriation  that the constitution of New-Jersey expressly adopts this common law, and that the legislature have, by particular act, enacted and incorporated into their system the common law doctrine of allegiance?
1. By the common law, expatriation is not barely not permitted, but it is distinctly prohibited. The maxim of that law is nemo potest exuere patriam. By the common law, allegiance is perpetual. Bracton, Coke, Hale, Foster, and Blackstone consider this as a fundamental principle of that law. Mr. Swift, 1 vol. L.C. 164, very properly observes, that this is the law of such of the United States as have adopted the common law without altering this principle.
2. The 22d section of the constitution of New-Jersey adopts the common law of England generally, except such parts as are inconsistent with the rights and privileges of that charter. The gentlemen have relied on this exception; and the only question must be, whether this doctrine of the common law is inconsistent with the rights and privileges of that constitution. Now; I am at a loss to discover, how perpetual allegiance to the government established in New-Jersey under the authority of the people, can be inconsistent with the rights of that charter which created and set in motion that very government. What is the true meaning of this exception in the 22d section? what are the rights secured by that charter? The principal are, a republican form of government; legislative council and general assembly; annual election; freedom of conscience in matters of religion; trial by jury, &c. These are the rights alluded to; and it is easy to see that all those parts of the common law which grow out of the monarchy of England were inconsistent with these rights. But not so is that principle which would transfer the sacred duty of *317 allegiance, formerly due to the king, with equal force and effect to the new sovereign, the people themselves.
It was further stated that the preamble of the constitution asserts fundamental principles which are inconsistent with this common law notion of allegiance: Such as that all power is derived from the people  that protection and allegiance are reciprocal  that when a prince violates the fundamental laws he abdicates and dissolves the government, and remits the people to their primitive rights.  This is all very true; but it is equally true in England by the common law as here: it leaves the doctrine of allegiance where it was; but on great occasions transfers the duty of that allegiance from one man to another  or from one form of government to another. These principles were all recognized and acted upon in England in the revolution of 1688. But did that revolution change the doctrine of perpetual allegiance? No! it transferred it from James to William, but the law remained the same. The same turn was attempted to be given to this event in M`Donald's case, Foster, C.L. 60, but it was repelled by the court, not only as unfounded in law, but even as bringing a reproach on that glorious revolution. Then not being within the exception, it stands on the broad basis of the common law, which the people of New-Jersey have though proper to adopt, and which, I trust, they will not be soon persuaded to throw away.
3. But the common law doctrine of allegiance has been expressly enacted into our code by the legislature of New-Jersey. Wilson's N.J.L. 4. The treason act adopts the common law definition and division of allegiance in its very language and terms: "whereas, all persons abiding within this state, &c. do owe allegiance to the government of this state and are to be deemed members thereof," and "all persons passing through, &c. owe temporary allegiance." Here then we have an exact common law description of permanent and local allegiance. Afterwards the act proceeds to define the crime of treason, in which it pursues the provisions and uses the very words (mutatis mutandis) of the statute of Edward 3d. Now, what is the conclusion? The people, in their very constitution, adopt the common law  the legislature take up the common law idea and division of allegiance, and pursue even the English statute of treasons as far as it was in any manner applicable. *318 The common law import of the term allegiance being settled, it follows conclusively that the words must receive the same interpretation when introduced into the statute. That common law expressions must receive the common law exposition, is too clear to admit of doubt. Hence, we find that the advocates of the doctrine of expatriation have endeavoured, by all means, to get rid of them. It is matter of curiosity to look into 3 Dallas, 141, to see the pains the learned gentlemen who then first broached this doctrine, took to get rid of expressions having a fixed meaning by the common law. The terms allegiance and subject were thought to contain sounds discordant to the ears of a freeman: Obedience and citizenship were to be substituted. Allegiance was feudal  it denoted only the submission of a slave to his master. It was monarchical  unworthy a republican, who ought not to owe allegiance even to the people themselves  In short, it could not exist in a free country. The term subject was also disgraceful: A subject must have a master; that master must be a tyrant, and of course the appellation was only fit for slaves. But citizen was a name worthy of a freeman, and the true name by which a republican was to be known. The gentlemen shew their discretion in trying to get rid of terms of known signification and import, and substitute in their stead the most uncertain and vague. But, unfortunately for the argument in this case, the plain men who formed the constitution of New-Jersey were not carried away by such refinements. They supposed (perhaps weakly) that allegiance might be due to the people as well as to the king, and that even a republican might be called, without offence, a subject, provided his master was the law. Therefore, they adopted these terms of known signification; and these expressions must be explained according to their known and established legal import at the common law. But even if the common law and the constitution and law of New-Jersey did admit this idea of expatriation, it might be safely contended that Daniel Coxe never exercised the supposed right. An act of this kind to work such important consequences should be unequivocal, and certainly intended by the person to produce the effect. If it might exist consistently with the continuance of his former connections it shall not be construed to dissolve them. Now, his removal to England and remaining there ever since, is no act of expatriation. Having traded as a British merchant is not inconsistent with our position. *319 It has been determined in Westminster-Hall that a British subject naturalized here, is an American merchant within the treaty of 1794, and may, as such, trade to the East-Indies against the charter to that company. Neither can the fact of receiving compensation from the British government for losses during the war, be considered as an expatriation. That was common to all the royalists; yet those who returned have always been received as subjects on taking the oaths of allegiance. Much less can the circumstance of his calling himself a British subject alter his condition. If he had called himself an American citizen without right it would not make him such; so if he is really a subject of New-Jersey in the contemplation of the law of the state, his calling himself a subject of Great-Britain would not make him an alien to New-Jersey. But Mr. Coxe was correct in calling himself so; he was born such and is such; but the state of New-Jersey, by declaring him a subject, and punishing him as such, have also taken him as their subject; and by law have only done what is commonly produced by the act of the party; that is to say, created a kind of double allegiance; a matter which happens here every day in the case of the naturalized Englishmen.
The course I have pursued relieves me from the task of following the gentlemen through the general research they have made to support the right of expatriation. If the common law prohibits it; if the people of New-Jersey have adopted that common law, and the legislature enacted its provisions, it matters little what foreign jurists think of this question.
I will make but a few very general remarks.
1st. If the known maxims of the common law are to be disregarded and titles to land tested by the reasoning of modern writers, and by general principles of abstract right, the learned counsel against us have overlooked a very important point. They should have examined their own objection and tried how that would comport with the theory of modern times. The reasons on which the disability of an alien to hold lands is founded may be truly said to be more unsatisfactory than those on which the doctrine of allegiance is founded; and the policy of the United States, with such an immense wilderness to subdue, seems to *320 point out the propriety of inviting foreigners, by all the inducements which a clear right to hold lands brings with it, to populate that wilderness. The reasons for the exclusion were partly feudal, and all such have ceased to exist with that system; and partly political, and those rendered by my lord Coke are of little weight, and doubtful policy, since the extension of trade and the increase of money. But the gentlemen are reduced to the necessity again of being inconsistent; they adhere with inflexibility to one maxim to exclude our title, and repudiate another more important, clear, and settled, to effect the same purpose.
2d. If this thing called expatriation really exists as a right, it can only be founded on mutual consent. Not only the party who gives up his allegiance but the state must accede to it. This public consent can be expressed only in one way by law: Hence it follows that if the right, strictly speaking, exists, it must be dormant until put in motion by a law. This law will regulate the forms, settle the terms, and determine the consequences of expatriation. As it is now contended for, it is without any such restrictions. A man may shake off his allegiance one year and put it on again the next; it may go and come as often as whim and caprice shall dictate. The state of New-Jersey have never recognized by law this right; much less have they regulated it: until they have, it must remain useless and inoperative. No state in the union but Virginia has passed an act recognizing and regulating the right of expatriation.
3d. and lastly. The treaties between the United States and Great-Britain which have also been used against us, so far from aiding the gentlemen are against them. That of 1783, stipulates that no future loss shall happen on account of the part taken by those in the situation of Mr. Coxe, during the war. But if his right to inherit lands is taken from him for that reason, he has sustained a future loss. The only fair and liberal construction of this treaty is, that the royalists were by it restored to all rights which they possessed before, not actually divested and gone at the time of that treaty. The treaty of 1794 recognizes the idea that the antenati might hold lands and stipulates that their heirs may do the same. Both together, we apprehend, fully protect the right of Mr. Coxe. It could not be denied but that if Miss Coxe, the intestate, had been herself *321 a British subject, that Mr. Coxe might, within the very letter of that treaty, have claimed as her heir. It would be harsh indeed, to put him in a worse condition, because she was a subject. On the whole, it is submitted that the judgment below ought to be affirmed.
Ingersoll in reply. The doctrines advanced upon the present occasion are, to me, novel, strange, and alarming.
That the postnati, against whom we have no cause of complaint, should be excluded, while the antenati are preferred who injured us. That the French who aided us are called aliens, while the British loyalist refugee may hold lands as a citizen, is a language I do not understand. If the law is so, it is strange, and I must abandon an idea I have always cherished, that the rules of law were founded in sound sense.
Daniel Coxe being more than twenty-one years of age at the commencement of the revolution, adheres uniformly to the British interest in attempting to reduce the United States to submission to British claims. The attempt failing, at the conclusion of the war he quits this country, settles in England, claims to be a British subject, and is so acknowledged by that government from 1777, to 1805.
In 1802, a relative dies in New-Jersey, to whom Daniel Coxe is next of blood, and claims to succeed by right of descent as an American citizen. The next of blood, who is a citizen of the United States, excepts to him as an alien, and claims in her own right.
I make two questions in this cause.
1. Did Daniel Coxe expatriate himself? This question is naturally subdivided into two others; viz. Had he a right so to do? and has he exercised that right?
2. Did such expatriation incur the disability of alienage? and is he thereby prevented from taking lands by descent in the United States?
I ask, (and it is a question of magnitude) could Daniel Coxe, and has he expatriated himself and become a subject of the king of Great Britain?
*322 This is a new case in the history of nations, to which the little case of Calvin, the Scotchman, bears no proportion.
The revolution which dismembered the mighty empire of Britain, is a subject of curious, of interesting  and as introductory on this occasion  of profitable contemplation. Its leading principle was the reverse of what has been stated by the opposite counsel, or I am ignorant of its origin and design.
I insist that when the authority of the mother country, as it was called, was rejected, the inhabitants of the former colonies were so far in a state of nature, that each man was at liberty to choose his side  remain a subject, or become a citizen. This interval of election continued until new systems of government were formed, adopted, and organized, after which period, (not previously) residence was an implied assent to share the fortunes and the destinies of the United States. In Pennsylvania the rule was practically exemplified in the memorable case of Chapman, the British light-horseman, charged with treason. 1 Dal. 53.
When government is regularly established, a majority with propriety governs the minority; to institute it legally, individual assent is necessary, or it deserves the name of usurpation, and ought to be execrated as tyranny. 1 Wilson's works, 316, 317.
New-Jersey proceeds in a temperate, mild and correct course. The constitution of the 2d of July, 1776, offers the right of suffrage without imposing its exercise on all the inhabitants. Constitution of New-Jersey, section 2, 3, 4, 13.
In perfect conformity to the principle for which I contend, treason could not be committed, even by joining an invading army, until after the 4th of October, 1776, Wilson's New-Jersey Laws, p. 4. The period is, in effect, extended by the provisions of the act of the 5th of June, 1777, offering to restore to the rights of freemen all who would return and comply with certain conditions by the 1st of August, then next.
*323 In 1777, Daniel Coxe joins the enemy as a fugitive and offender; and in August of the same year, an inquisition is held to forfeit his real estate for treason supposed to be committed about the 9th of April preceding and judgment was rendered thereon in February, 1779.
The counsel opposed to us exultingly say Daniel Coxe is by this means recognized as a citizen, charged with the crimes incident to that character only, and entitled in return to the privilege of holding land, and cite authorities in support of the position.  1 Bl. Com. 371. 2 Bl. Com. 249.
We admit that he could take lands  so might an alien  but he could not hold in either capacity. In high treason the forfeiture of lands accrues not from the time of conviction, but from the date of the offence.
If the right of election had passed, the right of expatriation succeeded.
I am told at the commencement of the argument that I misunderstand and misapply terms, and consider as synonimous, what are entirely distinct, if not of opposite meaning, Expatriation and Emigration. That the last is of natural right, the former of municipal regulation. That emigration cannot be restrained, but expatriation requires the consent of the government. Emigration only suspends the activity of allegiance; expatriation dissolves it, precludes from taking lands, and renders the issue aliens.
This suggestion accords perfectly well with the views of my learned antagonist; but does he shew any authority in support of his explanation? None  it is the offspring of his own creative imagination.
Is it credible that the conventions of Pennsylvania, Kentucky, and Vermont thought it necessary to restrain their legislatures from preventing temporary absences of their citizens retaining their political connections within their respective states?
*324 A train of reasoning is unnecessary on this point; 1 find the text and the comment together. 1 Wilson's works, 311. Tucker's Blackstone, vol, 1. part 2. Appendix, p. 96. Has a state the right to prohibit the emigration of its members? May a citizen dissolve the connection between him and his country? Judge Tucker considers expatriation and emigration of the same import. In Judge Wilson's works the word expatriation is not used in the whole lecture. The 9th article and 25th section of the constitution of Pennsylvania is introduced, and the whole course of argument shows the word emigration is to be understood as co-extensive with expatriation.
Taking the word emigration then in its most extensive sense, is the right of expatriation, as has been represented, the mere whim of modern, fanciful, theoretical writers?  I say it is as ancient as the society of man.
It is only by establishing the converse of the proposition, the common law idea that the natural born subject of one prince cannot, by swearing allegiance to another, or by any other act, discharge himself from his allegiance to the former, that the principle of emigration can be made a matter of doubt. 1 Tuck. Bl. part 2d. Appendix, p. 90. I deny that this common law principle is founded in, or consonant to the divine law, the law of nature, the law of nations, or the constitution of the state of New-Jersey. The bible is the most venerable book of antiquity; there we find expatriation practised, approved, and never restrained. The family of Jacob became subjects to the Egyptian monarch. Moses abandoned Egypt, his native land, and David left Saul, his prince.
The law of nature, abstractedly considered, knows neither prince nor subject. From this source, therefore, the common law principle cannot be derived.
Particular nations have prohibited their people from migrating to another country, but the prohibition did not arise from the practice of nations towards each other. At Athens, after a man examined the laws of *325 the republic, if he did not approve of them, he was at liberty to quit the country with his effects. By the constitution of the Roman commonwealth, no citizen could be forced to leave it, or not to leave it, when made a member of another which he preferred. Even under the emperors, as long as any remains of liberty continued, it was a rule that each one might chuse the state of which he wished to be a subject or citizen. Where did the Romans get their laws? From the Grecians. Where did the Grecians get their laws? From the eastern nations  the Aborigines of the earth. The right of expatriation, therefore, as far as we can trace it, has been recognized in the most remote antiquity. Among modern nations the practice is various; the Muscovites forbid it; in Switzerland it is permitted: some princes consider their subjects as riches  as flocks and herds, and their edicts correspond to these false notions. Vattel b. 1, c. 19, § 225. Consult jurists, Grotius, Puffendorff, Burlamaqui, Vattel, they are of opinion, that every man has a natural right to migrate, unless restrained by laws, and that these cannot restrain the right but under special circumstances, and to a limited degree. The strong and masculine understanding of Mr. Locke revolted at the illiberal ideas of English jurisprudence in this particular; he examined the right claimed to prohibit emigration, and declares that examples of emigration are frequent in history profane and sacred, and that it has been the practice from the begining of the world to the time he wrote. Wyckefort has a section, the title of which is, the prince may employ foreigners in his embassies, even in their own country. Wyckefort, p. 116, 119. After a narrative in which he shows, that this had been the practice of Europe, he proceeds to consider its propriety, which he infers from the right of expatriation. Mr. Rawle has read as cited, that passage to which Mr. Tilghman did not refer, and omitted to answer what Mr. Tilghman did read.
Lastly the constitution of New-Jersey, is founded on sentiments which repel the idea of perpetual allegiance, and imply and include the right of expatriation.
Whatever diversity there may have been in the sentiments *326 of writers, and in the laws and practices of states on the subject of emigration in general, there never has been a doubt in this country, but that when a civil war takes place, each member of the society has a right to choose his side.
The first view we have of New-Jersey and Daniel Coxe, is in a state of enmity, the state treating him as a refugee; Daniel Coxe declaring himself a British subject, acting in concert with an invading army.
Trace the circumstances distinctly, and we shall find the right of election between the two governments restored to him, and that he expatriates himself with the consent of, if not propelled thereto by the state of New-Jersey.
On the 11th of December 1778, the legislature of New-Jersey passed an act whereby they disfranchise all persons who were of the character and had pursued the conduct of Daniel Coxe. At the treaty of peace, his treason was cancelled, forgiven, buried in oblivion, or at least remembered only to prevent restitution of his forfeited estates. The disfranchising act continued in full operation, unrepealed, and unaffected by the restoration of harmony between the two countries. Under these circumstances he had his choice; he might have returned to New-Jersey, or to any other state. The principles of the constitution justified him in becoming a British subject, within the rules of expatriation, as stated by the opposite counsel. That he made his choice is proved by unequivocal evidence, that leaves no room for doubt or controversy as to the fact.
Mr. Rawle has himself enumerated eight heads, under which the evidence of his expatriating himself, and becoming a British subject may be classed. 1. Joining the British army in 1777. 2. Voluntary residence with them at Philadelphia and New-York. 3. Holding civil offices under the king. 4. Trading as a British merchant. 5. Holding lands as a trustee. 6. Receiving pensions and rewards as a British subject. 7. Describing himself as such. 8. Having never taken an oath of allegiance to the state of New-Jersey.
*327 A case was cited (Wilson v. Marryat, 1 Bos. & Pul. 430) to shew that the exercise of trade as a citizen of one country, is compatible with a continuance of allegiance to another. It was the case of John Collet, who was under the supposed tie not only of permanent, but perpetual allegiance from birth. But Daniel Coxe was not born in the allegiance of the state of New-Jersey, nor ever voluntarily took upon himself that obligation. The principle of that decision is consonant to British ideas, but in direct hostility with those which led to the American revolution, gave birth to our constitutions, and without which our brightest patriots were rebels.
It is impossible to doubt from what appears on the record, that he is under repeated positive oaths of allegiance to the king of Great Britain. According to the sound reasoning of Wyckefort, these were sufficient to sever the strongest connection between the United States and a citizen, much more such a relation as was subsisting (if any) between the state of New-Jersey and Daniel Coxe; involuntary, disclaimed, and inconsistent with the duties imposed upon him by his engagements to another country.
The naturalization law of congress is full proof that in the estimation of the people of the United States, an oath of allegiance to one country is an expatriation from a former; and that whoever becomes a citizen here, ceases ipso facto, to be a subject elsewhere. If this is not the meaning of our law, we encourage the unhappy victims to sacrifice themselves at the shrine of perjury. Characters, such as Mr. Coxe are considered by the same law, as expatriated, as aliens, and being no longer citizens; he having been attainted of treason by the state of Pennsylvania in the year 1778.
By the naturalization act of April 14th, 1802, 6 vol, Laws of United States, p. 74, 80, § 4, attainted loyalists, and such as have been legally convicted of having joined the army of Great Britain during the late war, cannot be naturalized without the consent of the legislature of the state, in which such persons were proscribed. All the courts of the United States, therefore, *328 could not naturalize Daniel Coxe, without the consent of the states of New-Jersey and Pennsylvania, in both of which he has been proscribed.
From all these considerations, it is inferred that Daniel Coxe did expatriate himself; that he had a right so to do;  that he has legally exercised that right, and has thereby become a British subject, and is not an American citizen.
Did such expatriation induce the disability of alienage, and is Daniel Coxe thereby incapacitated from taking lands in the United States by descent?
We are charged with inconsistency, that while we endeavour to exclude the liberal sentiments of the common law as applied to antenati, we insist on the rigid rule of the same law, in preventing aliens from holding lands in the United States.
This charge will be effectually repelled by a single passage, from an authority cited by the opposite counsel for a different purpose. 1 Tucker's Bl. part 2d.p. 371. If an alien could acquire a permanent property in lands, he must owe an allegiance, equally permanent with that property, to the king of England, inconsistent perhaps with former allegiance, and productive of many other inconveniences. By the civil law a contract for land by an alien is void. The forfeiture to the prince is peculiar to England, or at least to countries where the feudal system has prevailed. 1 Bl. Com. 371. Cod. l. 11, tit. 55.
Was it from deference to the common law, that the objections urged against the treaty of London were, that it paved the way for British influence, by enabling aliens of that country to hold lands in the United States?
If the natural and primitive allegiance may be put off without the consent or concurrent act of the prince to whom it was first due, expatriation must induce alienage.
Virginia has recognized the right, and considers the *329 person who has exercised it, as no longer a citizen. Tuck. Bl. part 2, p. 360, 361.
If expatriation be a right when legally exercised, it must induce alienage, and the revolution is a case in point, to show that a man is not obliged to continue the subject of that prince under whose dominion he was born; otherwise, contrary to a position contended for by Mr. Rawle, we must admit that America was not independent until the king of Great Britain acknowledged her independence; and that it was the consequence of, and not antecedent to, the treaty of peace.
Expatriation is substantially a putting off or change of allegiance. As to the removal from one country to another, it is a mere immaterial, accidental circumstance. It will be agreed that if it can be done in the country, it can by going out of the country.
Nations may shake off their allegiance, says Mr. Rawle, but individuals may not. Grotius said just the contrary; and surely, as Judge Tucker observes, if all might, any one might, with the same reason.
Granting for a moment that the common law of England is as barbarous as the case of M`Donald, (Foster 59) would induce us to suppose, how has it been translated to the United States, to be in active operation, slandering the principles of our revolution. I consider the case of Talbot v. Janson as establishing the proposition that expatriation was a right, the fair exercise of which produced alienage with its respective rights and disabilities.  3 Dall. 133, 152, 164.
Of Hamilton and Eden I know nothing. Lord Fairfax's case is not in print, but from what fell from his honor Judge Washington, I presume it went upon similar grounds to that of Calvin. I throw into the opposite scale, as at least an equal weight, the decision in the case of the Charming Betsy, where expatriation was expressly recognized, and as operating the extinguishment of the previous character of citizen of the United States. It is in point as to both particulars.
*330 I conceive the general rule, at least so far as it is necessary in the instance of Daniel Coxe, is fully established, and that expatriation is a right, which, when fairly exercised, changes the allegiance; and that it has been so exercised, by which he ceased to be an American citizen, became an alien, and as such incapable of holding lands by purchase, or taking by consent, unless there be an exception out of the rule in his favor, as an antenatus.
The burden of the argument devolves upon our antagonists. Let them show when, and by what means, the exception in favor of the antenatus, derived from the principle of perpetual allegiance by birth, has been adopted among us.
Because, say the counsel for the defendant in error, the constitution of New-Jersey adopted the common law, of which this is a part, therefore the rule is imperative on this occasion. What! all the common law of England? that which respects the royal prerogative, the hierarchy, the idea that allegiance is personal to the king from the subject, not duty on the part of the citizen to the state.
The common law of England, say Judge Tucker and Judge Wilson, was only so far adopted in the states, as it was proper and applicable to the situation and the circumstances of the colonies; and was different in different colonies.
The adoption by New-Jersey is guardedly expressed. "The common and statute law of England, as have "been heretofore practised in this colony, not repugnant "to the rights contained in this charter, shall be "in force."
Two questions arise for the consideration of the opposite counsel. Was the principle for which they contend in previous practice in New-Jersey? Is it not repugnant to the privileges contained in that charter?
A double task devolves on our opponents. They must shew that what they ask, was in practice in the *331 colony of New-Jersey before the formation of the constitution. This is impossible; the case could not occur; it could not, in the nature of things, be in contemplation of the convention. The expression had reference to the mere detail of municipal law. Here then our antagonists must fail.
Can they succeed better in the other part of the proposition? Is not a claim, founded on the idea of perpetual allegiance by birth, repugnant to the rights and privileges contained in that charter?
They say, on the contrary, that allegiance and protection are reciprocalties, and claim, as a right and privilege, to refuse the former when the latter is withdrawn.
Three, out of seventeen states, says Mr. Rawle, have declared emigration a right not to be restrained by the legislatures. I say it is the principle of the revolution; it pervades each and every constitution, without which the whole proceeding is crime, rebellion, and treason.
If the common law, introduced through the constitution, fails, what is the next prop by which it is attempted to support a claim in opposition to the language of our revolution?
We are told that the capacity of British subjects to hold lands in the United States is recognized by the treaties of 1783 and 1794, and that surely it was not meant to encourage them to purchase that we might escheat. This part of the argument is introduced by a reference to Judge Tucker for the distinction between aliens by birth and aliens by election. 1 Tuck. Bl. part 2, page 102, s. 2.  I acknowledge that Judge Tucker does state, that, by the treaty of peace, the common-law principle that the antenati of both countries were natural born to both, and as such, capable of holding, or inheriting, seems to be revived.  As far as respects authority, I oppose to Judge Tucker, the Virginia assembly, who expressly declare that all persons not being citizens of the United States are aliens. 1 Tuck. Bl. part 2, page 55. Judge Tucker founds himself, as to the common-law principle, upon Bracton and Calvins case, not adverting to the difference in point of fact, that the British who claim, as in this instance, never were in allegiance to our states.
*332 Further, he does not observe that the whole reasoning is founded upon the false hypothesis that allegiance by birth is perpetual. He acknowledges that by the declaration of independence the colonies became a separate nation from Great Britain; yet, according to the laws of England which we still retained, the natives of both countries, born-before the separation, retained all the rights of birth. War makes aliens enemies. They were enemies  then aliens.
With the New-Jersey convention I understand the matter differently; and that the law of England ceased until revived; and was revived only as heretofore practised.
On this mistaken ground it is, as I shall endeavour to shew, that he infers that American natives were capable of inheriting lands in England, and the natives of England of inheriting lands in America.
If this doctrine is founded upon the idea of perpetual allegiance by birth, it must stand or fall with its principal.
Commentators, it is said, often find in Homer, what Homer never thought. It appears to me that the same observation applies to the commentaries we have heard upon the treaties of 1783 and 1794.
Let it be recollected that congress on the 27th of November, 1777, earnestly recommended it to the several states to confiscate and make sale of all the real and personal estate of such of their inhabitants, and other persons, as had forfeited the same.
The legislatures did confiscate the lands of antenati as escheated, and it was never suggested to be a violation of the common-law of the land. In order, however, to vest the property in lands of an alien in the commonwealth, offices of intitling, and of instruction, were necessary in some states.
In some states acts of assembly declared that the estates of the persons proceeded against should be vested and adjudged to be in the actual possession of the commonwealth without any other office or inquisition. In others, real property belonging to British subjects, loyalists, and others, had been only sequestered, not confiscated, *333 and the profits appropriated during the war; the estate to wait the disposal of the legislative provision on the return of peace. In some instances the lands of loyalists and others had not been actually seized and taken into the possession of the states respectively where situated, and therefore the forfeitures and confiscations were not considered as completed. In these several ways real property remained to loyalists and others which was considered as not yet confiscated. This is the key to unlock the secrets of the provision in the treaty.
I contend, therefore, that the, 6th article of the treaty of 3d September, 1783, as far as respects property, is confined in its letter, spirit, and meaning, to the preservation of estates owned antecedently to the war, which had not been actually confiscated and seized; and to the consequences of an active part taken during that period.
This construction is perfectly warranted by the case decided in Connecticut, (Kirby's Reports) and by the principles as laid down by that very eminent English lawyer, Woodeson.
The distinction of antenati and postnati, the security of future acquisition, or the operation of general principles arising from political situations not the penal consequences of an active part taken in the war, were not then in contemplation.
Twelve millions of rich aliens allowed to purchase lands in a country owned by two or three millions of people comparatively poor: would it not have been thought madness! I conceive that this clause is precisely co-extensive as to its objects in guarding against injury to the person and to the property. It preserves from injury to their property the same persons who were to be secured in their personal liberty.
In the first place, this comprehended many who were considered as citizens of the United-States, but who had committed crimes against their country.
*334 Was the property to be restored to them at one moment, says Mr. Rawle, for the purpose of being taken from them the next?  By no means. The stipulations extend to preclude any criminal proceedings for what had been done during the war. The effect of alienage was left to considerations of policy. Our commissioners, I trust, would not have suffered any interference by the British on that head.
This article was intended to prevent punishment, not to secure reward. If the loyalist is put upon the same footing as the ally in the war, he has no cause of complaint.
There must be no future loss; no damage by reason of the part which any have taken during the war. It is not asked. If Daniel Coxe had fought under general Washington and at the peace expatriated himself, and become a British subject, the rule for which we contend would have been equally applicable. Many of the people came back, and were naturalized under acts of assembly, and of course hold their lands; such as Mr. Gordon in Pennsylvania, and others.
The construction of the treaty attempted by our opponents, can only be maintained by reference to the common law doctrine, that natives of Great Britain were constructively born in America.
The 5th article assists in the construction of the 6th, and is recommendatory where the confiscation laws had been actually carried into effect. The 9th article of the treaty of the 19th of November, 1794, is in perfect unison with the ideas I submitted to the consideration of the court. Different ideas had been entertained in the different states as to the policy of permitting aliens to hold lands. It was always a matter of state regulation. In Pennsylvania they might purchase;  now they may take by descent.
The treaty, therefore, so far from looking to future acquisitions by purchase, is confined to those who now hold.
*335 It is observable that Judge Tucker does not express himself decidedly. He uses the qualified and guarded expression that the treaty seems to have revived the common law principle that the antenati of both countries were natural born to both. He qualifies his argument still further, by saying, British subjects born since the separation are aliens; but such of them as were born before the definitive treaty of peace took place seem to be entitled to the benefits thereof, so far as they had, or might be presumed to have, any interest in lands in the United States. All others appear to be aliens in the strictest sense of the word, except as their cases may have been remedied by the late treaty of the 19th Nov. 1794.
Daniel Coxe had no interest in lands in the United States, and could not be presumed to have, on the 3d of September, 1783.
It is curious to observe the unreasonable consequences to which this doctrine of antenatus leads.
If the loyalist died and left an unoffending infant, his lands escheat.
If he leaves an antenatus who had waged war against us, he succeeds to the possession.
Say with Judge. Tucker that under the equity of the treaty of peace, giving it the most liberal construction, all rights of British subjects, actually vested, not divested, were protected; and that when such rights relate to lands, the persons having such right, if not then citizens, had their whole life time to become citizens; which, if they neglected to do, their lands at their deaths would be equally subject to escheat as those of any alien naturalized, and dying without heirs other than aliens. How is this reconcileable with his doctrine of antenati being entitled to purchase, take by descent, and every other mode of acquisition? Or, with his argument that the common law principle from which this doctrine of antenati flows, that of perpetual allegiance by birth, has never been translated as a part of the common law into the United States? How can he reconcile it to his consure *336 and strictures upon the determination of Judge Ellsworth in Williams's case? He himself acknowledges that after the 28th of October, 1795, no British subject can purchase lands within the United States, so as to be protected by that treaty.
If once this whimsical doctrine of antenatus be admitted it will give rise to an infinity of perplexing questions.
An attainted loyalist, if he retains his citizenship may return and be immediately eligible as a member of the house of representatives or the senate. After 14 years residence, though he cannot be naturalized without the consent of the state in which he was proscribed, yet he may be president of the United States.
I inter from all these considerations that the expatriation of Daniel Coxe induced the forfeiture of alienage, and that he is thereby precluded from taking lands by descent in the United States of America.[*]
Cur. ad. vult.
NOTES
[] Present, Cushing, Paterson, Washington, and Johnson, Justices.  The Chief Justice did not sit in this cause, having formed a decided opinion on the principal question, while his interest was concerned.

The importance and interesting nature of the questions involved in this case, it is hoped, will apologize for publishing the arguments of counsel before the ultimate decision of the cause.
[*] S.C. in this court, see ante p.
[*] WASHINGTON J. said that there was an appeal in that case to the supreme court, which was not decided, the state of Virginia having compromised the cause.
[] This case was decided by the Supreme Court of Connecticut, before Richard Law, Ch. J. Oliver Elsworth, Roger Sherman, and William, Pitkin, Justices, and was as follows.

An estate was mortgaged by Fitch to Stephen Apthorp, then of Bristol in England, who died January 1st, 1773, leaving the plaintiff his only heir. It was moved in arrest of judgment, that it appears by the declaration that the plaintiff is an alien, and therefore, cannot by law, hold any real estate.
By the Court.
A state may exclude aliens from acquiring property within it of any kind, as its safety or policy may direct; as England has done with regard to real property, saving, that in favour of commerce, alien merchants may hold leases of houses and stores, and may, for recovery of their debts. extend lands, and hold them, and upon ouster have an assize. Dyer 2. 6. Bac. Ab. 84. But it would be against right that a division of a state or kingdom, should work a forfeiture of property previously acquired under its laws, and that by its own citizens; which is the case here.
The plaintiff's title to the land accrued while she was not an alien, nor could she be affected by the disability of an alien, but was as much a citizen of the now state of Connecticut, as any person at present within it, and her descent was cast under its laws.
Her title is also secured by the treaty of peace, which stipulates that there shall be no further forfeitures or confiscations on account of the war, upon either side. The subsequent statute of this state, declaring aliens incapable of purchasing or holding lands in this state, does not affect the plaintiff's title, otherwise than by recognizing and enforcing it, for it hath a proviso that "the act shall not be construed to work a "forfeiture of any lands, which belonged to any subjects of the king of "Great Britain before the late war, or to prevent proprietors of such "lands, from selling and disposing of the same to any inhabitant of any "of the United States." It is not indeed expressly said, that the proprietors of such lands may maintain actions for the possession of them, but this is clearly implied; for lands without the possession are of no use; and whenever the law gives or admits a right, it gives or admits also every thing incident thereto, as necessary to the enjoyment and exercise of that right; and besides, they cannot sell their lands till they first get possession of them; for all sales of land in this state, whereof the grantor is dispossessed, except to the person in possession, are, by express statute, void: so that the plaintiff is not barred of her title, or right of action, either at common law or by statute
[*] The case of M`Ilvaine v. Coxe's Lessee, by mistake dated February, 1804, was the first case decided in February Term, 1805.